SO ORDERED.

SIGNED this 22nd day of April, 2020.



_____
Robert E. Nugent
United States Bankruptcy Judge

_____

**PUBLISHED**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN RE: | |
| MICHAEL GAYLORD FLINN, NETA SUE FLINN | Case No. 19-11273 Chapter 13 |
| Debtors. | |
| IN RE: | |
| CHRISTOPHER CHARLES ENGEL SONDRA LEE ENGEL | Case No. 19-11351 Chapter 13 |
| Debtors. | |

**<u>MEMORANDUM OPINION</u>**

Below-median-income debtors' plans must run a minimum of three years

unless the court approves a longer period for cause, up to a maximum of five years.

In these chapter 13 cases, the trustee objected to confirmation, asserting that the

1

debtors hadn't shown cause for extending their plans beyond three years and that the Flinns' plan had been proposed in other than good faith. The trustee also asserted that plans extended beyond three years must run for a determinate number of months, rather than as long "as necessary to pay" the allowed administrative, secured, and priority claims. The debtors demonstrated good cause to voluntarily extend their plans—they simply can't afford the payments necessary to accomplish their plan goals within three years. The Flinns are proceeding in good faith. Finally, nothing in the Bankruptcy Code or Rules mandates that plans extended beyond three years must run for a determinate number of months. No one presented any evidence whatsoever of the administrative ramifications of indeterminate plan terms. The Court concludes that both plans should be confirmed as filed.[1]

<u>Facts</u>

*Michael and Neta Sue Flinn*

The Flinns are retired and living on social security and their individual retirement account funds. They owe a mortgage on their home of about $200,000, a car loan of $15,299 secured by a 2012 Honda Pilot with over 90,000 miles, and a boat loan of $17,464 that is secured by a bass boat and its trailer.[2] Their home is valued at $232,100. In addition to the Honda, the Flinns own a Chevrolet S10 pickup truck with nearly 180,000 miles that is valued at $1,356 and a Ford F250

---

[1] An evidentiary hearing was held March 18, 2020. January M. Bailey of Eron Law, PA appeared on behalf of debtors Flinn and Engel. The Chapter 13 trustee Carl B. Davis appeared in person, and by his attorney Karin N. Amyx.

[2] Debtor Ex. 1.

pickup with slightly over 180,000 miles they value at $7,089. The pick-ups are unencumbered. The Honda and Ford are the debtors' exempt vehicles. The Flinns also scheduled a debt of $23,064 to Wyndham Vacation Resorts that is secured by a timeshare condominium in Orlando, Florida. Related to this debt is a scheduled unsecured claim of Reed Hein & Associates, also known as the "Timeshare Exit Team," a law firm in Bellevue, Washington that the debtors employed to extricate them from the Wyndham obligation. Mrs. Flinn testified that the timeshare debt and the $7,000 plus they spent with Reed Hein, combined with initial overly aggressive draws on their retirement accounts, forced them to file this case.

In their plan, the Flinns propose to pay their mortgage and the boat payment direct, outside their plan. They will make the Honda payment through the trustee. They propose to surrender the timeshare. Both the home mortgage and the boat loan will mature after the end of five years. They must also distribute not less than $6,417 to their unsecured creditors (having claims of $35,051) to meet the best interests of creditors' test.[3] Mr. Flinn uses the boat to fish around Wichita. Mrs. Flinn says they often eat what he catches, but that they could do without it and still survive. The boat payment adds $194 to their monthly expenses which, other than food expenses at $600 each month, seem reasonable in amount. Nevertheless, Mrs. Flinn testified that it is difficult for her and her husband to live within their budget's constraints.

---

[3] This amounts to an 18% dividend to general unsecured creditors.

3

Mrs. Flinn was candid about financial misjudgments that led to the Flinns' petition. The Flinns withdrew funds from their IRAs to consolidate and repay credit card debts they owed to Chase and Bank of America with a loan from Emprise Bank. Despite having paid Chase $7,000 and Bank of America $4,000, they still owe Chase $6,512, Bank of America $4,322, and Emprise $9,429. In addition, they repaid a loan from their daughter of $7,200 shortly before filing this case. The estate's likely preference claim is included in the debtors' best interests of creditors calculation. The debtors preferred to address that payment in chapter 13 than to file a chapter 7 case and subject their daughter to preference avoidance litigation. Before filing, the Flinns significantly reduced their IRA distributions in an effort to preserve their nest-egg and, according to their Schedule I, they draw about $2,000 from their IRAs while receiving over $3,000 monthly in social security benefits.[4]

The Flinns are below-median-income debtors and cannot afford to repay these obligations in three years, their applicable commitment period. According to their plan calculations, a three-year payment would be not less than $803 monthly.[5] According to Flinns' Schedule J, their monthly net income is only $539, including what they receive from social security.[6] Therefore, they propose to make a $510 monthly payment, extending the plan term "as necessary to pay the allowed administrative claims, secured claims, and the greater of priority claims or the

---

[4] By comparison, according to their Form 122C-1, the Flinns were drawing an average of $5,279 from their retirement accounts before filing.

[5] Debtor Ex. 4.

[6] Social security benefits are excluded from "current monthly income," *see* § 101(10A), and "projected disposable income," *see* § 1325(b)(2).

4

amount listed in section 15 [$6,417 - the liquidation value]."[7] The Court calculates that the debtors will need to make sixty monthly payments of that amount to complete the plan ($30,167 ÷ $510 = 59.15 months).[8]

*Christopher and Sondra Engel*

Christopher and Sondra Engel are also below-median-income debtors, but remain in the workforce. Mr. Engel is an administrative assistant at a Kansas state prison. Mrs. Engle is a bus aide for the El Dorado school district. The day before this hearing, Kansas Governor Laura Kelly announced a full shut-down of all Kansas schools as part of the state-wide effort to control the spread of the novel coronavirus, lending uncertainty to Mrs. Engel's employment going forward. The Engels have limited incomes to pay their rent and car payments. They have one child who suffers from serious chronic medical problems. That child will begin school in the fall of 2020. The Engels are repaying three secured claims. They owe MidAmerica Auto Finance $14,800 secured by a 2014 Chevrolet Cruz with 73,000 miles.[9] They also owe Auto Choices LLC $1,912 secured by a 2005 Dodge Stratus with 117,000 miles.[10] In addition, they owe RNR Tire Express $479, secured by the four tires on the Stratus.

The Engels, like the Flinns, propose to extend the plan term as necessary to repay these secured debts, together with allowed administrative and priority

---

[7] Doc. 2, §§ 3.5 and 15.
[8] *See* Debtor Ex. 4.
[9] Debtor Ex. 5. This is a 910-car loan claim, requiring payment of the amount of the debt, *see* "hanging paragraph" at § 1325(a)(5)*.
[10] Debtor Ex. 5. This is a non-910-car loan claim that debtors are exercising cram down, requiring payment of the value of the vehicle, *see* § 1325(a)(5).

5

claims, at $430 per month.[11] According to their amended Schedule J, the Engels'
disposable income is $432 monthly, before considering Mrs. Engel's recent potential
loss of employment. If they attempted to repay these debts over three years, their
payments would be $675, well beyond the Engels' ability to pay. Under the plan as
proposed, it will take them nearly five years to pay these debts using all their
disposable income to do so ($25,635 ÷ $430 = 59.61 months).[12] On the hearing date,
the debtors were one payment behind on their plan owing to having been garnished
immediately before filing. The Engels will pay no dividend on general unsecured
claims that total more than $77,000—much of which is comprised of medical debt.[13]

Analysis

The trustee objects to these plans on several grounds, but ultimately these
two cases are his vehicle for asserting that the Bankruptcy Code requires below-
median-income debtors' plans that are extended beyond the three-year applicable
commitment period (ACP) must run for a fixed number of months. In addition, the
trustee questions whether these debtors have shown cause for extending their
plans' term. He also challenges the Flinns' good faith in proposing their plan. I
address these three issues *seriatim*. The debtors have the burden of proving that
their plans meet the confirmation requirements in § 1325(a).[14]

1. The Code Limits Plan Duration—the ACP and § 1322(d).

---

[11] *See* Doc. 2, §§ 3.5 and 15.
[12] *See* Debtor Ex. 5.
[13] *See* Debtor Ex. 3.
[14] *In re Wark,* 542 B.R. 522, 533 (Bankr. D. Kan. 2015) (citing *Alexander v. Hardeman (In re Alexander),* 363 B.R. 917, 921-22 (10th Cir. BAP 2007)).

**6**

Before the Bankruptcy Reform Act of 1978 established the Bankruptcy Code, wage-earner debtors rearranging their affairs under former chapter XIII often found themselves in a state of perpetual repayment. The 1898 Bankruptcy Act contained no temporal plan limitation. Congress found that it was not uncommon for these debtors to be yoked to plans lasting ten years or more, stating that—

> . . . in certain areas of the country, inadequate supervision of debtors attempting to perform under wage earner plans have (sic) made them a way of life for certain debtors. Extensions on plans, new cases, and newly incurred debts put some debtors under court supervised repayment plans for seven to ten years. This has become the closest thing there is to involuntary servitude . . . . [15]

Section 1322(d)'s salutary purpose was to place specific limitations on chapter 13 plans. Debtors could extend those plan periods for up to five years only if the extension was "completely voluntary, and not imposed on the debtor by creditors or the chapter 13 trustee."[16] As will be discussed below, such extensions require a showing of cause. None of the parties to these cases dispute that the debtors have voluntarily sought their extensions for the simple reason that they cannot pay what they must in three years because of their income limitations. The trustee argues that plans cannot be extended for an indefinite time. Both plans propose to extend the plan term "as necessary" to pay the claims they treat. The trustee says that the Code requires a finite number of payments be proposed and that certain administrative problems arise when they aren't. The debtors argue that nothing in

---

[15] H.R. Rep. No. 595, 95th Cong., 1st Sess. 117 (1977), quoted in Richard Levin & Henry J. Sommer, Eds.-in-Chief, 8 COLLIER ON BANKRUPTCY ¶ 1322.18[1][b] at 1322-62.3 (16th ed. 2020) ("COLLIER").

[16] 8 COLLIER, ¶ 1322.18[1][b].

the Kansas Form Chapter 13 Plan, used across the District, requires a finite number and that the administrative burdens the trustee posits can easily be addressed. They also note that the other Chapter 13 trustees in the District do not require what this trustee seeks.

In 2005, BAPCPA introduced the ACP concept as part of requiring *above*-median-income debtors to pay their projected disposable income based upon the national expense standards found in the Internal Revenue Manual as opposed to their actual disposable income based on their schedules.[17]  Those debtors are required to commit their disposable income to the unsecured creditors over five years unless they can pay them in full sooner.[18] Below-median-income debtors need not engage in that hypothetical analysis. Rather, § 1325(b)(1) requires that a below-median debtor pay either (A) unsecured claims in full or (B) all of debtor's disposable income to be received in the ACP from when the first plan payment is due. Disposable income for these debtors is calculated by subtracting actual expenses "reasonably necessary to be expended . . . for the maintenance or support of the debtor or a dependent of the debtor . . ." from the debtors' current monthly income ("CMI").[19]  Section 1325(b)(4) defines the ACP  "for purposes of this subsection [1325(b)]" as three years unless debtor is above-median (in which case the ACP shall be "not less than 5 years") and it may be less than 3 or 5 years, as

[17] Section 1325(b)(3).
[18] Section 1325(a)(4)(A)(ii) and (B).
[19] Section 1325(b)(2)(A)(i).

8

applicable, if the plan provides for full payment of the unsecured claims over a shorter period.[20] Neither of these plans provides for full payment.

Thus, a below-median debtor's ACP is generally three years under § 1325(b)(4)(A)(i). Below-median debtors need only pay their projected disposable income during that time, provided their plan meets the other confirmation requirements in § 1325(a). That includes the requirement that their plans return to the unsecured creditors no less than they would receive in a chapter 7 liquidation—the "best interests of creditors" requirement found in § 1325(a)(4).

Section 1322(d)(1) provides that above-median income debtors may not propose a plan longer than five years. The Flinns and Engels are below median. Section 1322(d)(2) states that their plans *can't* provide for more than three years of payments unless the court approves a longer period for cause—up to a maximum of five years. Section 1329, contains parallel provisions concerning the duration of post-confirmation modifications. Modifications may extend "the time" for payments, but not for more than "a period that expires after the applicable commitment period" unless the court approves a longer period for cause. [21] The court cannot approve a period longer than five years from the date the first payment under the original confirmed plan came due.[22]

The trustee argues that courts, including the Tenth Circuit Court of Appeals, have held that the ACP is "temporal," *i.e.*, that debtors who are paying less than in

---

[20] Section 1325(a)(4)(A) and (B).
[21] Section 1329(a)(2).
[22] Section 1329(c).

**9**

full must pay for a set period rather than simply pay an amount equal to three years' payments in advance. Referring to a dictionary definition of the word "period," he asserts that periods define a length of time in days, months, or years. But there are many definitions of this word. A period may be "the interval between the successive occurrences of an astronomical event…a portion of time, often indefinite, characterized by certain events… [or] "the general term for any portion of time."[23] Under that set of definitions, a "period" can be, as stated in §§ 1322, 1325, and 1329, a number of years. Nothing in the Code demands it be a whole number. One certainly couldn't logically argue that the words "a longer period" as found in § 1322(d) and § 1329(c) by themselves dictate that said period be a definite number of months or years. Rather, the period can be "longer" than three years but not more than five.

The trustee emphasized BAPCPA's "policy" that debtors should be required to pay "the maximum amount to unsecured creditors they can afford."[24] But, for below-median debtors, that amount is no different than it was before BAPCPA. Debtors have always been required to pay unsecured creditors all of their disposable income, just not less than what those creditors would receive in chapter 7. If, as the debtors approach the three-year limit of their plans, they cannot meet the best interests test or meet some other plan requirement, they can modify their plan to extend it beyond three years, but not more than five years counted from the date

---

[23] Webster's New World Dictionary, Second College Ed., p. 1057 (1970).
[24] Doc. 40, p. 7.

the first payment on the original confirmed plan came due. There are no references in §§ 1322(d) or 1329(c) to "months," far less to a specified number of them.

The trustee also emphasizes that the National Form Plan, ordained for adopting districts in Fed. R. Bankr. P. 3015(c) as Official Form 113, contains a payment term that reads:

> Debtors will make regular payments to the trustee as follows: $____ per ____ for ____ months …. If fewer than 60 months of payments are specified, *additional monthly payments will be made to the extent necessary to make the payment to creditors* specified in this plan.[25]

The courts of this District didn't adopt the national form, opting instead for a Kansas-grown form plan devised by a committee of practitioners, trustees, and judges as they are authorized to do by Rule 3015.1.[26] Even so, nothing in the National Form Plan requires that an extended plan run for a specified time, other than that it be sufficiently long to make the specified payments to creditors. Thus, the National Form Plan lends the trustee no support in his arguments here.

The trustee's legal authorities also fail to carry the day. Heavy emphasis is placed on *In re Escarcega*, a Ninth Circuit Bankruptcy Appellate Panel (BAP) case.[27] In *Escarcega*, the BAP considered a group of chapter 13 debtors' plans that sought to modify the Northern District of California's Model Plan which required a fixed plan term. The debtors inserted nonstandard provisions permitting them to pay off their plans early by including language that "once the debtor has paid all

---

[25] Off. Form 113, ¶ 2.1. Emphasis added.
[26] Fed. R. Bankr. P. 3015.1. *See* Second Amended S.O. No. 17-1 Order Adopting Form Chapter 13 Plan, entered Nov. 16, 2017.
[27] 573 B.R. 219 (9th Cir. BAP 2017).

allowed secured and priority claims and administrative expenses as provided for in this plan, the plan shall be deemed completed and no further payment to the trustee shall be required."[28] The plans then proposed a minimal to zero dividend to the unsecured creditors. The BAP noted that this language "insured that the unsecured creditors would never receive any payment on their claims."[29] They were abetted in this effort by the chapter 13 trustee who provided debtors with an informal "draft" objection to enable debtors to resolve trustee's concerns and entice the trustee to recommend confirmation, but the objection was not filed with the bankruptcy court. By bypassing the formal objection process, the § 1325(b) confirmation requirements for unsecured creditors, including debtors committing their disposable income during the ACP, would never be invoked. The BAP noted that § 1302(b) imposes the duty to object to non-compliant plans on the trustee. Instead, the trustee's sub rosa arrangement with the debtors enabled them to confirm plans that ran counter to the Code and Ninth Circuit authority.[30] In essence, the trustee intentionally decided to ignore the ACP. The BAP reacted predictably:

> We agree that chapter 13 trustees have a difficult job and that creditors are well advised to protect their own interests. We cannot agree, however, that a chapter 13 trustee should decide on a categorical basis, for no apparent reason, not to raise an important objection which could benefit unsecured creditors.[31]

---

[28] *Id*. at 227. This is similar to the language in the Flinn and Engel plans.
[29] *Id*. at 224.
[30] In the Ninth Circuit, plans must run for either three or five years, depending on whether the debtor is below- or above-median income. *See In re Flores*, 735 F.3d 855 (9th Cir. 2013).
[31] *Escarcega*, 573 B.R. 219, 235.

To the debtors' arguments that "probable or expected plan durations" are permissible, the BAP conceded that no language in either §§ 1322 or 1325 requires a debtor to provide a fixed term or a minimum duration in the absence of an objection. But that doesn't mean that debtors may simply complete early to deny unsecured creditors any payment. Rather, the payments requirement must also be considered in light of §§ 1328 and 1329. Plan completion is a necessary prerequisite of obtaining a discharge under § 1328(a). If the debtor's income changes and an unsecured creditor or the trustee wishes to modify the plan, that motion must come before plan completion. Evading the ACP effectively encourages early completion which cuts off a creditor's or trustee's modification rights even during the ACP. The BAP also noted that estimating plan length would produce the same result in that no one would know whether the plan is complete for modification purposes. That would run counter to the Ninth Circuit's requirement that plans be for a specific time period, either 36 (for below-median debtors) or 60 months (for above-median debtors).[32]

What the *Escarcega* debtors attempted is the conceptual opposite of what these debtors propose. Both the Flinns and Engels offer plans *longer* than their 36-month ACP and neither is using the completion-driven plan term to work around paying unsecured creditors. Unlike the form plan in the Northern District of California, the Kansas Form Plan does not require a specific number of plan payments. There is no Tenth Circuit analog for *Flores*. Both sets of debtors are

---

[32] *See Flores, supra.*

paying exactly what they can—which is not much—by remaining in chapter 13 longer than 36 months. Indeed, they cannot afford to complete their plans in 36 months. Nothing these debtors has proposed violates the Code as it is written and interpreted in this Circuit. *Escarcega* is factually distinct from these cases and not persuasive.

The trustee says that these plans create undue administrative burdens on his office. Though he offered no evidence of those burdens, his counsel noted in argument that because of the trustee's software, it would be possible for a debtor to complete payments under a plan longer than three years without the trustee knowing that. That would raise the "risk" that the debtor might attempt to modify the plan after completion, something that § 1329 prohibits. It doesn't require sophisticated software to determine how many months a debtor's plan as proposed will last; that is a matter of arithmetic. That calculation will be an estimate at best because, as Judge Lundin notes in his online treatise, "[a]ny calculation of plan duration assumes timely payments by the debtor and no postpetition claims."[33] The duration calculation involves determining the debtor's disposable income, the amounts necessary to retain secured property and the interest rate applicable to secured creditor payments; the debtor's best-interest amount (§ 1325(a)(4)'s chapter 7 net liquidation amount), if any;  the amount of arrearages that must be cured, the amount of priority claims that must be paid, and the trustee's fee on plan

---

[33] Keith M. Lundin, LUNDIN ON CHAPTER 13, § 112.3, at ¶ 13, https://LundinOnChapter13.com (last visited Apr. 13, 2020) (hereafter "LUNDIN").

payments[34] This is subject to an almost infinite number of anticipated and unanticipated variations, both at the beginning and as plan performance progresses, whether the initial plan specifies a determinate number of months or not. Both the Flinn and Engel plans set out amounts that need to be paid and propose payments. Dividing the monthly disposable income (proposed monthly payment) into the sum of what is to be paid through the plan should yield an approximate anticipated duration in number of months. That small additional task doesn't seem burdensome considering the rigorous investigation and analysis the trustee and his staff already do on every proposed plan.

Finally, the trustee argues that I should not be governed by custom and usage in the Topeka and Kansas City divisions where this issue has yet to rear its head. The debtors argue that by raising this issue, the trustee continues to foster a less-favorable environment for chapter 13 filings in the Wichita division. The Court earnestly hopes that is not the case. But there is a legal argument against my modifying the Kansas Form Plan or adopting a form plan different from that used in the other divisions. Fed. R. Bankr. P. 3015.1 permits "a district" to adopt a plan different from Official Form 113 (the National Form Plan) if certain conditions are satisfied. The first one is "a *single* Local Form is adopted for the district after public notice and opportunity for public comment."[35] If a trustee or any other court constituent wants the Kansas Form Plan modified, the Bankruptcy Bench and Bar Committee process is likely the best route to take, particularly when the change is

---

[34] LUNDIN, § 72.1, at ¶ 8.
[35] Fed. R. Bankr. P. 3015.1(a) (Emphasis added).

more practical than legal—as is the case here. There is no legal, factual, or practical basis for requiring below-median debtors who extend their plans beyond the ACP of 36 months to establish a finite number of monthly payments thereafter, so long as the plan doesn't run longer than five years.

    2.  <u>Cause Exists for Extending the Plan Term under § 1322(d)(2).</u>

The trustee objects that neither debtors have shown cause to extend their three-year plans. Here, both debtors want to extend their 3-year ACP because they cannot afford to pay their secured obligations, and in the Flinns' case, their best-interests amount, over three years. They need more time.

The law on this point is muddy and fact-driven. In § 112.4 of his online Chapter 13 treatise, Judge Lundin describes the cases on cause as "contradictory and offer[ing] few guidelines."[36]   Analyzing cause implicates any number of circumstances. Lundin suggests that articulating the cause for extending is helpful and that special circumstances will be persuasive. He recognizes cases where the plan was extended for cause because the debtor couldn't pay priority claims, secured claims, or a home mortgage arrearage within the 3-year ACP.[37] If an adverse effect will result from an extension, it should be denied.[38]

Collier's treatise mentions that the "usual reason" for extending plan payments is the debtor's inability to cure or to pay priority or secured claims in a shorter time.[39] "Extensions up to the five-year maximum should be allowed without

---

[36] LUNDIN, § 112.4, at ¶ 5.
[37] *Id.* at ¶ 8 (suggesting that this may be a special circumstance warranting extension).
[38] *Id.* at ¶ 9.
[39] 8 COLLIER, ¶ 1322.18[1][b] at 1322-62.3.

16

difficulty in these circumstances, since without them the debtor may be unable to obtain effective relief under chapter 13."[40] Collier also mentions that extensions may be allowed where the debtor wishes to pay a higher dividend to unsecured creditors.[41] Both the Flinn and Engel cases exhibit special circumstances.

In the Flinns' case, the trustee questions their desire to extend the plan term while maintaining their home mortgage and keeping the boat. But even if the Flinns jettisoned the boat and its attendant secured claim, the plan calculations show that they could not complete their plan in 36 months within their budget. Adding back the $194 boat payment to their income calculation only increases it to $733 per month, still shy of the $805 they would need to service the plan in 36 months. Further, the majority of their income comes from an exempt source—social security. That amount is more than sufficient to pay the house and boat payment along with part of their monthly expenses. No matter how long their plan, they still need to repay the unsecured creditors the best-interest amount generated by their preferential transfer to their daughter. They certainly show cause to extend, even without the boat, because they really have no other chapter 13 option.

The Engels' case is even more persuasive. They cannot retain the two cars they need, plus tires, while making a payment that would retire their obligations in

---

[40] *Id. See In re Norris,* 165 B.R. 515, 517 (Bankr. M.D. Fla. 1994) (extension of plan to pay priority and secured claims where debtors are unable to do so within 36 months constitutes cause provided they are applying all available disposable income to the plan); *In re Fries,* 68 B.R. 676, 680-81 (Bankr. E.D. Pa. 1986) (inability to cure mortgage delinquency, priority claims, and secured claims in less than 49 months was cause to extend plan for more than three years).

[41] 8 COLLIER, ¶ 1322.18[1][b].

17

three years. Even their extended plan seems like a heavy lift, given the Engels's current circumstances. But consigning them to chapter 7 in no way benefits the creditors and places them at risk of losing virtually everything. That is certainly not consistent with the policy aims of chapter 13 and cuts against their hopes for a fresh start. Like the Flinns, they have no other chapter 13 option.

Both the Flinns and the Engels have demonstrated cause to extend the plan term up to sixty months.

3.  The Flinns' Plan is Proposed in Good Faith—Section 1325(a)(3).[42]

The trustee also objects that the Flinns have not proposed their plan in good faith because they seek to retain an unnecessary fishing boat by prolonging their plan and stretching out payments to their unsecured creditors. In essence, they are retaining something they don't need and arguably can't afford at the expense of the unsecured creditors.

The Tenth Circuit cases *Flygare*[43] and, more recently, *Cranmer*,[44] address the relevant circumstances bankruptcy courts should consider for the good faith inquiry into "whether the plan abuses the provisions, purpose or spirit of Chapter 13."[45] Among the *Flygare* factors the trustee relies on here are the probable duration of the plan (addressed at length above); the percentage of unsecured debt to be paid;

---

[42] Though his brief alludes to both sets of debtors, his contentions in the pretrial order only state an objection to the Flinns under § 1325(a)(3).
[43] *Flygare v. Boulden*, 709 F.2d 1344, 1347-48 (10ᵗʰ Cir. 1983) (adopting 11 non-exclusive factors from *United States v. Estus (In re Estus),* 695 F.2d 311 (8th Cir. 1982)).
[44] *Anderson v. Cranmer (In re Cranmer),* 697 F.3d 1314 (10th Cir. 2012) (debtor's social security income could not be considered in good faith inquiry where it was expressly excluded by the Code from the projected disposable income calculation).
[45] *Flygare,* 709 F.2d at 1347 (quoting *In re Estus,* 695 F.2d 311, 315).

18

the extent of secured claim modification; the type of debt to be discharged; and the burden of administration. Apart from *Flygare's* economic factors, *Cranmer* instructs that the good faith inquiry should be narrowed to considerations like inaccuracies in debtor's schedules, misrepresentations that mislead the court, or unfair manipulation of the Code.[46]  In applying the factors, courts should remember that it is "not bad faith for [a debtor] to adhere to the provisions of the Bankruptcy Code and, in doing so, obtain a benefit provided by it."[47] The Flinns are doing exactly that.

### Percentage of Unsecured Debt to be Repaid

The Flinns offered to pay about 18% of their unsecured creditors' claims from their projected disposable income, an amount that meets the best interests of creditors test in § 1325(a)(4). Their social security income is legally excluded from their "projected disposable income" under § 1325(b)(2) and is not necessarily available to the unsecured creditors. In the absence of some other badge of bad faith, nothing prevents them from applying some of that exempt income to their home mortgage or their boat payment rather than to the unsecured creditors.

They don't (and can't) propose to cram their Honda car loan down—it's a 910-day car claim—and they agree to pay the boat loan outside the plan per contract.

---

[46] *See Cranmer,* 697 F.3d at 1319 n. 5 (noting that most of the *Flygare* factors are subsumed by § 1325(b)'s ability to pay criteria and narrowing the good faith inquiry to factors such as accuracy of schedules, misrepresentations that mislead the court, or unfair manipulation of the Code).

[47] *Id.*  at 1319. *See also, In re Pasley,* 507 B.R. 312, 320 (Bankr. E.D. Cal. 2014) (taking advantage of provision of the Bankruptcy Code is not indicative of lack of good faith, citing *Drummond v. Welsh (In re Welsh),* 465 B.R. 843, 854 (9th Cir. BAP 2012), *aff'd* 711 F.3d 1120 (9th Cir. 2013)).

**19**

Like the home mortgage, the boat loan will run beyond the life of the plan and, as such, would be eligible for curing and maintenance under the provisions of § 1322(b)(5). Shoe-horning it into the plan might reduce the boat loan interest rate, but it would increase the payment amount necessary to pay the loan in full during administration—at the expense of the unsecured creditors. Unlike many debtors, the Flinns can call on their social security income, to pay those debts.

*Secured Claim Modification*

There's nothing untoward about the debtors paying for their Honda inside the plan, reaping a slight interest discount, while leaving the boat outside. Chapter 13 is designed to allow debtors to retain their assets, exempt and otherwise. This is an eight-year-old car with nearly 80,000 miles that might be hard to replace for the same payment. Their proposed treatment of the car loan is hardly unusual in chapter 13.[48]

*Type of Debt to be Discharged*

The debtors seek to discharge the kinds of consumer debt most debtors bring to bankruptcy.

*Burden of Administration*

As discussed above, the trustee failed to adduce any evidence that his administrative burdens would be increased by this rather simple plan.

---

[48] The Court also notes from experience that auto loans are commonly amortized over 5-7 years in today's market, depending on the age of the vehicle and amount financed. Few are financed over 3 years.

*Unfair Manipulation*

Is retaining the boat an "unfair manipulation" of the Code? The Flinns are paying the boat and home loans outside the plan, presumably from their social security income which is expressly excluded from CMI. Even if they surrendered the boat, their projected disposable income would not increase.[49] They still couldn't complete their plan in three years. Examples of "unfair manipulation" range from "inaccurate schedules and egregious prepetition conduct to serial filings."[50] None of those circumstances exist here.

While chapter 7 might be an attractive legal option for the Flinns, it wouldn't be very livable for them. They would have to (1) reaffirm their home mortgage; (2) reaffirm their vehicle debt up to the contract rate; (3) lose their boat and second pickup to the trustee's liquidation; and (4) suffer the trustee's avoidance and recovery of the payment to their daughter as a preference. A chapter 7 trustee would be lucky to repay the unsecured creditors what this plan proposes, especially given the expense of administration and substantially greater litigation and collection risk.

The debtors aren't retaining and paying for a yacht. Instead, this small boat and trailer appears to be the debtors' principal source of leisure (and a limited source of food). Their expenses are not otherwise out of line.[51] On these facts, I

---

[49] In any event, the Trustee did not object on § 1325(b) grounds.

[50] 493 B.R. 584, 595 (Bankr. D. Kan. 2013) (quoting *In re Wilcox,* 251 B.R. 59, 66 (Bankr. E.D. Ark. 2000). *See also In re Lavilla,* 425 B.R. 572, 576-77 (Bankr. E.D. Cal. 2010).

[51] Compare the facts here to those this Court confronted in *In re Sandberg*, 433 B.R. 837 (Bankr. D. Kan. 2010). There the above-median debtors, one of whom was receiving

cannot conclude that these debtors are unfairly manipulating the Code's provisions. The trustee's good faith objection should be overruled.

<u>Conclusion</u>

There is no legal requirement that below-median-income debtors seeking to extend their applicable commitment period beyond three years must state their plan's term in a finite number of months. Cause to extend the three-year period is shown when the debtor cannot pay secured and required unsecured debt within the applicable commitment period. Counsel proposing such plans do well to clearly articulate the basis for a cause finding in the plan itself. Finally, applying the *Flygare* factors and *Cranmer*, I cannot find that the Flinns' plan is offered in other than good faith. The Engel and Flinn plans comply with § 1325 and are CONFIRMED.

# # #

---

unemployment compensation, sought to retain and pay for an inoperable $20,000 cabin cruiser while paying unsecured creditors about 2%.